THOMA v. IRVING SAVINGS INST. et al.

(Supreme Court, Appellate Division, First Department.    February 17, 1911.)

ASSIGNMENTS (§ 137*)—SAVINGS DEPOSITS—MENTAL CAPACITY—EVIDENCE.

Evidence in an action to recover savings deposits under an assignment *held* to show mental capacity of the assignor.

[Ed. Note.—For other cases, see Assignments, Dec. Dig. § 137.*]

Dowling, J., dissenting.

Appeal from Special Term, New York County.

Action by Catherine V. Thoma against the Irving Savings Institution and others. Judgment dismissing the complaint, and plaintiff appeals. Reversed, and new trial ordered.

See, also, 139 App. Div. 904, 123 N. Y. Supp. 1144.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, MIL-LER, and DOWLING, JJ.

Benjamin & Taylor (Weyland E. Benjamin, of counsel), for appellant.

Studin & Sonnenberg (Louis M. Sonnenberg, of counsel), for respondents Rodgers.

Robert E. Deyo, for respondent Irving Savings Institution.

CLARKE, J. This action was originally brought against the Irving Savings Institution to recover certain deposits made by William Rogers, deceased; the plaintiff claiming under a written assignment from him. Agnes J. Rodgers, the sister of William Rogers, by order of interpleader was made a party defendant, as administratrix of William Rogers; and Edward Rodgers, the brother of the decedent, was also made a party defendant by said order, because two of the accounts in question stood in the name of William Rogers, in trust for Edward Rodgers. The court dismissed the claim set up by Edward Rodgers, and he has not appealed. The contest, therefore, is between the plaintiff, claiming upon an alleged assignment from William Rogers, and his administratrix, claiming that the accounts were his absolute property at the time of his death.

The learned court at Special Term made the following findings of fact:

"That the alleged assignment offered by the plaintiff in this action, dated January 11, 1909, purporting to assign and transfer the moneys on deposit in the Irving Savings Institution, at No. 115 Chambers street, borough of Manhattan, city and state of New York, to Catherine V. Thoma, of No. 367 Prospect street, Long Branch, state of New Jersey, was not executed by William Rogers, and does not assign the said accounts, as it purports to; that the said alleged assignment, dated January 11, 1909, is null and void, and was and is without consideration of any kind; that William Rogers, on January 12, 1909, and for some time prior thereto, was insane and of unsound mind, memory, and understanding, and was thereby rendered incapable of making or of understanding the alleged assignment set forth in the complaint herein, as the plaintiff well knew; that on said January 11 and 12, 1909, the said William Rogers was in a dying condition, and was incapable of transacting any business, and his mind was so affected and enfeebled that he was absolutely and completely incompetent to comprehend the nature of his acts."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

127 N.Y.S.—45

And judgment was rendered dismissing the complaint upon the merits, adjudging that the Irving Savings Institution pay the accounts in question to the administratrix, and that the plaintiff deliver up the alleged assignment to the clerk for cancellation, with costs to the administratrix and the Irving Savings Institution.

The finding that William Rogers, for some time prior to January 12, 1909, was insane, and of unsound mind, memory, and understanding, and was thereby rendered incapable of making or of understanding the alleged assignment, is not supported by the evidence, and is against the great weight thereof. Rogers was a singular character. He was 69 or 70 years of age at the time of his death, and left about $30,000 in various accounts deposited in several savings banks in the city of New York. He resided in Long Branch, N. J. He had never married. He left a brother and a sister, who lived in the city of New York, whom he occasionally saw on his trips to the city to make deposits or to have his interest written up. He was a miser, who, during the last 25 years of his life, had spent little or nothing upon himself. But he was not the kind of a miser who digs a hole in the cellar, pours in his gold, and then goes down to gloat over it from time to time. He was an intelligent miser, who put the money he could make or save in the savings bank, where it was not only kept safely, but where it bred interest. He had at least a good common-school education, was a great reader of newspapers, was accustomed to drive close bargains, was posted on financial affairs, talked with bank officials about stocks and bonds, in the days of horse racing at Monmouth Park got Appleby & Johnson to put money for him on the races, conversed intelligently with business men and his acquaintances, and comprehended what was said to him down to two hours before his death. He did wood-chopping and odd jobs, slept in barns and outhouses, and for many years lived at the Thoma's, sleeping in the barn, and being given his meals by them. It would seem that, if he was competent to accumulate $30,000 by every kind of self-denial and personal privation, to deposit it in savings bank, to have his interest written up from time to time, and to draw out said interest, he was competent to dispose of it. If he was able to make and save his money, he ought to have the right to give it away.

Thanksgiving Day he appeared to have a bad cold, and the Thomas insisted that he should come into the house; but he resisted until the Saturday thereafter, when, having been told that he would have to go to a hospital or come in, he finally consented, and he lived in the house thereafter until his death, on the 12th of the following January. Dr. Slocum began visiting him on December 19, 1908, and saw him a number of times after that, sometimes in bed, sometimes in a chair. He testified that:

"He had valvular heart disease and dropsy. His mind was clear. He answered intelligently all questions. I did not see anything irrational in anything he said."

He saw him on the 10th of January, and he saw him on the day he died, the 12th, between 10 and 11 o'clock, being with him 10 or 15

minutes.  He died some hours afterwards, but the physician testified:

"We didn't anticipate just at that time.  I was very much surprised when I learned that he had died that day."

On the 6th of January he sent for Mr. Woolley, who had been postmaster of Long Branch for 12 years and was secretary of the New Jersey Mortgage & Trust Company.  Mr. Woolley testified that Mrs. Thoma said:

" 'Rogers, here's Mr. Woolley come to make your will.'  And he says, 'What will?'  'The will that you were going to make, leaving me part of your property.'  He says, 'I don't want to make any will.'  He says, 'I want my bank books.'  'Well,' I says, 'Rogers, I can't get your bank books without a written order.  If you desire me to get your bank books, I will go down to the office, prepare an order, and come up to-morrow and have you sign it,' and he seemed to think that was all right.  At the time he said, 'I don't want to make any will,' he said, 'I am not going to die.'  On January 7th I told him that I had the paper for him to sign, and gave it to him.  He sat up in bed, and read this over once or twice.  He read it himself.  He read it twice before he signed it, and then I asked him if he was ready to sign, and he said, 'Yes.'  Then I got Mrs. Thoma to get a book to write upon, and he put the book on his knees and was seated up in the bed; that is, I steadied the book while he read the paper.  At the time I was there previously, he gave me this card to assist in drawing the assignment—this and several others; the card containing the number of the bank books that he wanted me to draw the order for.  He said the reason he wanted his books was because he wanted to see whether the interest had been credited on them.  He did not say anything to me as to what he was going to do with the money represented by these bank books at the time I saw him."

Mr. Pitcher, who testified that he was a justice of the peace at Long Branch, elected in 1855, and pretty continuously since, and was 84 years and 5 months old, testified that he saw Rogers on the 9th of January:

"I talked to him alone in the room.  He said: 'Yes, sent for you.  I want you to write me a will.'  'Well,' I said, 'I will go across to the schoolhouse, to the grammar school, and get paper, and I will come over and write it.'  Well, upon reflection he thought he would wait until Mr. Anthony Woolley, who had the power of attorney to get his bank books from New York, came, and then I could come in to write it, so that matter of making the will was put over until he could hear from Mr. Woolley.  Q. Did he say, when Rogers talked to you about giving his money to Mrs. Thoma, did he say anything about what she had done for him, make a reference to it?  A. It was out of gratitude to her.  He said she had nursed him, and taken a great deal of care of him during his sickness, and administered to his wants all his life with her, where she lives at present, and also where she lived at the upper village.  He said that he was going to make an assignment to Mrs. Thoma of the money in one of the banks.  I asked him, 'Should I do it?' and he said, 'No;' he was going to make it, and to give it to her in one of the banks.  Rogers did not say he wanted me to prepare the assignment.  He said he wanted me to write his will when Woolley returned with the books.  He said he was going to prepare the assignment.  I asked him, 'Do you want me to prepare it?'  He says, 'No; I am going to make it.'  He was not ready then until the books came back from New York.  He told me he could find me; he would send for me to make the will."

The assignment in question is as follows:

                                    "Long Branch, New Jersey, Jan. 11, 1909.

"I hereby in payment for services rendered for a number of years past, and especially during my present illness, assign and transfer all the money

I have on deposit in the Irving Savings Institution at No. 115 Chambers street, New York City, state of New York, together with all my rights under the same to Mrs. Catherine V. Thoma, No. 367 Prospect St., Long Branch City, state of New Jersey.          William Rogers.
      "Witness: John Cavanagh."

It is conceded that the signature to this paper was made by William Rogers, and a comparison between this paper and the paper signed by him and given to Mr. Woolley on January 6th, authorizing the savings banks to deliver the bank books, shows an equally strong and firm signature. It is also conceded that the body of the assignment is in the handwriting of Harriet Thoma, the daughter-in-law of the plaintiff, and that John Cavanagh signed his own name as witness. The testimony is that young Mrs. Thoma, at the request and under the dictation of Rogers, wrote this paper on the evening of January 11th, and that it was signed on the morning of the 12th.

If William Rogers wrote the signature, which is concededly his, upon that paper after it had been prepared, and on the morning of January 12th, as testified to, it was in my opinion a valid transfer, and the plaintiff would be entitled to recover in this action. That he was competent to understand its purport and effect seems to me to be thoroughly established by the three disinterested witnesses whose testimony I have alluded to. In addition, there is the testimony of the subscribing witness, of young Mrs. Thoma, and of Albert Thoma, the plaintiff's son. These witnesses were all inmates of the household, Cavanagh being a boarder, and the son and daughter-in-law, at least, may be considered as within the category of interested witnesses. The claim is made that the story told by Mrs. Harriet Thoma, that Rogers dictated the form of this assignment to her, is incredible, because he did not have the knowledge requisite to frame such an instrument; and the suggestion is made that, while the signature on the paper is concededly his, it had been placed some time previously upon a blank piece of paper, above which the assignment was written, and the paper witnessed after his death.

We do not now pass upon the validity of this paper. We think that a new trial is required in the interests of justice. We feel that the finding by the learned court that for some time prior to the 12th of January Rogers was irrational and incompetent, which we find unsupported by the evidence, may very seriously have affected the judgment. We point out that three witnesses have testified that the words "William Rogers," "John Cavanagh," and "Witness" were written at the same time, and in the same ink, and with the same pen by three different persons, and that the body of the paper was written the night before. There are ways of testing that testimony, and it ought not to be difficult to show whether the words "William Rogers" were written with the same pen and with the same ink as the words "Witness" and "John Cavanagh." If it should appear that they were not, it would furnish almost irrefutable proof that the paper was manufactured.

There are other matters in the record which may be satisfactorily disposed of upon a new trial. A pure question of fact is presented, and an affirmance by this court would be final. The charge made

against the plaintiff and the members of her family is so grave, the evidence in support thereof so doubtful, and the conclusion of the court on an important part of the case so lacking in support in the proof, that we deem it our duty to reverse this judgment and order a new trial, with costs to the appellant to abide the event.

INGRAHAM, P. J., and SCOTT and MILLER, JJ., concur. DOWLING, J., dissents.